**WAHL INSTRUMENTS, INC. and Robert Parker, Plaintiffs–Appellants,**

v.

**ACVIOUS, INC. and Kenneth J. McMillan, Defendants–Appellees.**

**No. 89–1664.**

United States Court of Appeals, Federal Circuit.

Dec. 12, 1991.

Richard F. Carr, Poms, Smith, Lande & Rose, Orange, Cal., argued, Allan Rothenberg, Poms, Smith, Lande & Rose, Irvine, Cal. (Glenn A. Clark, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, N.J., on brief), for plaintiffs-appellants.

George C. Meyers, Jr., Wigman & Cohen, P.C., Arlington, Va., argued (Victor M. Wigman, Ezra D. Rosenberg, Katzenbach, Gildea & Rudner, Lawrenceville, N.J., on brief), for defendants-appellees.

Before NIES, Chief Judge *, ARCHER, Circuit Judge, and KELLEHER, District Judge.**

NIES, Chief Judge.

Wahl Instruments, Inc., and Robert Parker (Wahl) appeal the grant of summary judgment of the United States District Court for the District of New Jersey, *Wahl Instruments, Inc. v. Acvious, Inc.*, 12 USPQ2d 1143, 1989 WL 136621 (D.N.J.1989), holding claims of U.S. Patent No. 4,137,769 ('769) invalid for failure to disclose the best mode contemplated by the inventor of carrying out his invention as required by 35 U.S.C. § 112 (1988). We reverse-in-part, vacate-in-part, and remand.

*Background*

In 1975, on a trip to Japan, William Wahl of Wahl Instruments, Inc., a West Coast wholesaler of various products, became familiar with a line of thermochromic and other temperature indicating materials— paints, crayons, labels, tapes and inks—of a Japanese company, Teika, and arranged to be U.S. distributor of the products. Wahl showed the materials to Robert Parker, an independent research engineer who conceived of using such materials in a clear plastic thermal analog of an object, which he perceived would be useful in cooking, canning or sterilization. By placing temperature indicating material in the analog which would change color at a known temperature, the internal temperature of the object being heated at the same time would be indicated.

In or about 1977, Parker made some crude prototypes of several types of devices of different compositions and made calculations from tests involving boiling the device in water as to their suitability as various analogs. One model was a pair of plastic slices of a cylinder bolted together; another was two halves of an egg-shaped device held together with adhesive. However put together, the thermochromic material was thereby sealed in between the two halves of the device. Wahl and Parker made an arrangement for Wahl to develop and market the invention in the form of an egg-timer device. Parker sought out Robert Burton, a well-known West Coast plastics fabricator, who explained various possible ways to make the device, and suggested modifications in angles and shape of Parker's models so that the device could be mass produced by the embedment molding technique. Embedment molding consists of layering plastic into a mold, followed by an adhesive pouring, onto which the thermochromic layer is placed, followed by a third pouring to complete the device. Parker supplied the thermochromic material to be placed in the device in the form of a paint or ink silkscreened on MYLAR, originally supplying a product of Teika which Wahl distributed. To reduce cost, Parker began to make the inserts himself using standard paint or ink produced by Teika or by a U.S. company Tempil. In due course, Burton made various sizes of the device for Parker to test as an egg-timer. Wahl was introduced to Burton and they worked out details of production and costs. Burton Plastics apparently began producing an embedment molded commercial version of the Parker egg-timer for Wahl shortly before the application was filed. The dates are unclear.

In 1977–78, Parker submitted his invention disclosure and a prototype he had made to a patent attorney on the East Coast who filed an application on February

---

* Chief Judge Nies assumed the position of Chief Judge on June 27, 1990.

** Judge Robert J. Kelleher of the United States District Court for the Central District of California, sitting by designation.

6, 1978, disclosing and claiming the invention in various shapes, *i.e.*, domed, cylindrical, and square, and with both reversible and nonreversible temperature indicating materials placed in the device. The prototype was a device in which two sections had been bonded together using a transparent adhesive. The patent issued on February 6, 1979.

In 1981, Kenneth McMillan was hired by Wahl and placed in charge of the project. He testified he visited Burton Plastics once or twice a week to discuss molding and production problems. In 1987, McMillan left Wahl to start a business making a competitive egg-timer. He used Burton Plastics as his fabricator and supplied thermochromic inserts which he ordered from a supplier simply by specifying he needed a red material that would be in paint form that changed color at 70 degrees.

McMillan and his company Acvious were sued for infringement by Wahl on March 11, 1987.[1] McMillan defended *inter alia* on the ground that the patent specification failed to disclose the best mode contemplated by Parker of carrying out his invention as required by 35 U.S.C. § 112. The district court denied a motion for summary judgment on this ground, but after the trial and after the decision of this court in *Dana Corp. v. IPC Ltd. Partnership*, 860 F.2d 415, 8 USPQ2d 1692 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989), the district court granted McMillan's motion. The district court's opinion states:

> The record reflects that Mr. Parker [the inventor] knew at the time of the invention that the best technique for the manufacture of the egg timer was an embedment casting or molding process in which a layer of thermochromic material is embedded in a transparent solid body by pouring a clear hardenable plastic into an open mold containing the layer of thermochromic material. Moreover, Mr. Parker knew at that time that the best transparent plastic material, for use in the embedment molding process for molding or casting the solid transparent body of

the egg timer was polyester resin. Parker also admitted that the best technique at the time of the invention for causing the layer of thermochromic material to be embedded in the transparent plastic egg timer was by silk-screening a thermochromic paint or ink onto one side of a thin substrate, such as transparent MYLAR film, and then die-cutting oval-shaped pieces from the substrate for use as inserts in the embedment molding process. It is also undisputed that the best thermochromic paints or inks known to Parker at the time for the silk-screening process were those made by the Japanese company, Tieka, or by the New Jersey company, Tempil.

*Wahl*, 12 USPQ2d at 1144. The district court ruled that the claims were invalid for failure to disclose the best mode because the patent failed to disclose each of the above specifics of fabrication which Parker had developed, in conjunction with Burton Plastics, for making the commercial version of the egg-timer and which Parker had testified he believed was, in each respect, the best manner or mode of manufacturing at the time his patent application was filed.

Wahl argues, nevertheless, that the best mode requirement was satisfied inasmuch as the techniques used to manufacture the Parker device were old and well known. Wahl points to Parker's testimony that the method of manufacture "would not really matter in terms of the invention because the true invention is in the materials used, in the general shape, and [in] the concept of a mid-plane material, and that the manufacture could be readily performed in any number of ways." Parker further testified:

> It was not clear to me in the '79 time period which would be the very best method. A lot of it would depend on the volume. We hadn't even tested the market then.

### Issue

Did the district court properly grant summary judgment of invalidity on the grounds of the inventor's failure to disclose

---

1. Parker was later joined as an involuntary plaintiff.

the best mode of his invention within the meaning of 35 U.S.C. § 112?

## DISCUSSION

### Focus of the Best Mode Inquiry

Under 35 U.S.C. § 112, a patent specification must "set forth the best mode contemplated by the inventor of carrying out his invention." The objective of this section is well established. The purpose of the best mode requirement is to restrain inventors from applying for a patent while at the same time *concealing* from the public preferred embodiments of their inventions which they have in fact conceived. *In re Gay*, 309 F.2d 769, 772, 135 USPQ 311, 315 (CCPA 1962), *quoted in Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1532, 3 USPQ2d 1737, 1742 (Fed.Cir.), *cert. denied*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987). The words in the statute are not without ambiguity. This case illustrates that the term "mode" and the phrase "carrying out the invention" are not definable with precision.

 As originally filed and issued, the patent was to cover reversible and nonreversible temperature indicating devices. The former, being reusable, were useful in timing the cooking of eggs. The latter would be used, per the specification, in autoclaves where a permanent indication was needed that a desired temperature had been attained. Also in the latter, the device could be made releasable so that the temperature indicating layer could be replaced, all of which was disclosed in the specification. Given the difference in performance, which embodiment was the "best mode" in this respect would depend on the use to which a device was put. By virtue of reexamination initiated after this suit was filed, the claims became limited to thermochromic (*i.e.*, reversible) devices. However, the best mode inquiry depends upon all of the circumstances at the time that the application was filed. *Spectra–Physics*, 827 F.2d at 1535, 3 USPQ2d at 1745. The fact that the application as filed covered several very different embodiments is a relevant consideration. In any event, having disclosed all contemplated

variations, Parker clearly satisfied the best mode requirement in the broadest sense. Of these different possible embodiments, in 1977–78 Parker had begun development of a commercial product only for the egg-timer. It is this activity that brought into question whether the best mode requirement of section 112 was satisfied.

The objection here is narrowly focused. The best mode defense is directed to the undisclosed manufacturing technique by which commercial versions of the egg-timers were made and to the materials and sources of supply for materials used in them. Thus, the attack is on nondisclosure of a mode. While McMillan's company had no difficulty duplicating the Wahl egg-timer because McMillan was fully familiar with all aspects of its manufacture while employed by Wahl, he asserts, in effect, that Parker concealed information concerning fabrication of the egg-timer *from others* whereby others would not be able to reap the full benefit of the invention upon expiration of the patent. We disagree that, on this record, the patent was invalid for failure to disclose the best mode.

 A description of particular materials or sources or of a particular method or technique selected for manufacture may or may not be required as part of a best mode disclosure respecting a device. *Christianson v. Colt Indust. Operating Corp.*, 822 F.2d 1544, 1562, 3 USPQ2d 1241, 1254–55 (Fed.Cir.1987), *vacated on other grounds*, 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). Thus, the particulars of making a prototype or even a commercial embodiment do not necessarily equate with the "best mode" of "carrying out" an invention. Indeed, the inventor's manufacturing materials or sources or techniques used to make a device may vary from wholly irrelevant to critical. For example, if the inventor develops or knows of a particular method of making which substantially improves the operation or effectiveness of his invention, failure to disclose such peripheral development may well lead to invalidation. *See Spectra–Physics*, 827 F.2d at 1535–37, 3 USPQ2d at 1744–46. On the

other hand, an inventor is not required to supply "production" specifications. *Christianson*, 822 F.2d at 1562, 3 USPQ2d at 1254–55; *In re Gay*, 309 F.2d at 774, 135 USPQ at 316. Under our case law, there is no mechanical rule that a best mode violation occurs because the inventor failed to disclose particular manufacturing procedures beyond the information sufficient for enablement. One must look at the scope of the invention, the skill in the art, the evidence as to the inventor's belief, and all of the circumstances in order to evaluate whether the inventor's failure to disclose particulars of manufacture gives rise to an inference that he concealed information which one of ordinary skill in the art would not know. *Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1531–32, 20 USPQ2d 1300, 1302–03 (Fed.Cir.1991); *Randomex, Inc. v. Scopus Corp.*, 849 F.2d 585, 587, 7 USPQ2d 1050, 1052 (Fed.Cir. 1988).

In this case, certain information missing from the Parker application—for example, embedment molding—was no more than a routine manufacturing choice. To invalidate the patent for this omission was error. Other missing data were not reviewed under the correct standard. Thus, the grant of summary judgment was improper.

### *Dana Corp.* v. *IPC Ltd. Partnership*

Fundamental to the error in the district court's analysis is the court's misinterpretation of *Dana Corp v. IPC Ltd. Partnership*. This was indicated both by the court's pre-*Dana* denial of the defendant's "best mode" summary judgment motion and by its rejection after *Dana* of plaintiff's argument, on defendant's renewed motion, that if the missing information on manufacturing was well-known to those of skill in the art, its specific disclosure was not required.

In *Dana*, this court overturned the denial of a JNOV motion on the ground that the district court erred in its understanding of best mode principles of law in ruling that "the best mode requirement could be satisfied by reference to what the prior art discloses." 860 F.2d at 419, 8 USPQ2d at 1695–96. In *Dana*, however, the inventor

stated in a report based on tests that a particular *old* technique, namely fluoride surface treatment of rubber seals, "is necessary to satisfactory performance of seal [to control leakage]." 860 F.2d at 418, 8 USPQ2d at 1695. The inventor himself also questioned why the patent application made "no reference ... to fluoride treated rubber." *Id.* Thus, the evidence showed that the inventor, in the words of the statute, "contemplated" a particular undisclosed method of manufacture to obtain a satisfactory seal.

The district court here read *Dana* overly broadly. As subsequently explained in *Chemcast Corp. v. Arco Indus. Corp.*, 913 F.2d 923, 926, 16 USPQ2d 1033, 1035–36 (Fed.Cir.1990), the best mode inquiry is to be answered, as it always had been, in the context of those skilled in the art. However, merely because a technique is generally *known* in the art, as in *Dana*, does not eliminate a best mode defect. As indicated, the *Dana* inventor thought, *i.e.*, "contemplated" that, the particular undisclosed old method of treatment was necessary to his invention and affected how well it worked.

In the present case, the district court equated Parker's nondisclosures with those of the inventor in *Dana*. We disagree.

### *Embedment Molding*

The patent specification fairly read describes a sectional device, two parts, between which a layer of temperature indicating material is placed. It states further that the two parts may be ultrasonically welded or joined by adhesive or by releasably clamping, or by "any other suitable or desirable means for incorporating a layer of temperature indicating material within the plastic body may be employed." There is no evidence that the working of the invention, unlike in *Dana*, was affected in any way by how the two halves were joined. In some of the disclosed embodiments and uses, releasably joining would be necessary. The embedment molding method was suggested by Burton Plastics, the fabricator, for making the egg-timer which was but one embodiment of the invention, because of the basic suitability of

an egg shape with one flattened side (a dome) to embedment molding and because of cost considerations. Parker also explained that he chose that method because, at the expected volume of production, it would be "best" for their purposes from a cost standpoint.

There is abundant testimony that embedment molding would be utilized if one in the business of fabricating solid plastic articles were asked to make the egg-timer device depicted in the drawings in the patent; and further that this technique was well known at the time the subject application was filed.

While admitting it was a simple device for a plastics fabricator to manufacture, appellees argue that those of skill in the art of making temperature indicating devices would not be skilled in the art of molding and, therefore, the absence of information with respect to embedment molding cannot be cured by reference to skill in the art to which the invention pertains. However, that observation merely confirms that Parker concealed nothing here respecting carrying out his invention by failing to reference embedment molding. His invention does not claim a method of manufacturing but the device itself, regardless of how actually put together, and also a method of using the device. As appellees indicate, one of skill in the art of temperature indicating devices would not be expected to be skilled in commercial fabrication of plastics. However, as McMillan's own expert agreed, anyone seeking to make the device commercially would have to do no more than present the drawings in the patent to an experienced plastics fabricator to learn that the device lent itself to embedment molding. The device differs little from the commonly made solid plastic paperweights with novelty items inside.

■ The district court apparently believed that Parker's "admission" of embedment molding being "the best technique for the manufacture of the egg-timer" was an admission that such technique was the best mode of carrying out the invention within the meaning of the statute. His "admission" does not carry such legal weight.

Any process of manufacture requires the selection of specific steps and materials over others. The best mode does not necessarily cover each of these selections. To so hold would turn a patent specification into a detailed production schedule, which is not its function. Moreover, a requirement for routine details to be disclosed because they were selected as the "best" for manufacturing or fabrication would lay a trap for patentees whenever a device has been made prior to filing for the patent. The inventor would merely have to be interrogated with increasing specificity as to steps or material selected as "best" to make the device. *A fortiori*, he could hardly say the choice is not what he thought was "best" in some way. Thus, at the point he would testify respecting a step or material or source or detail which is not in the patent, a failure to disclose the best mode would, *ipso facto*, be established. However, the best mode inquiry is not so mechanical. A step or material or source or technique considered "best" in a manufacturing circumstance may have been selected for a non-"best mode" reason, such as the manufacturing equipment was on hand, certain materials were available, prior relationship with supplier was satisfactory, or other reasons having nothing to do with development of the invention.

In this case, the inventor testified that embedment molding did not affect and was not thought to affect how his invention worked. McMillan's expert, Davis, fully agreed. In response to the question, "Do you subscribe any importance to the methodology by which you put all these things [the parts of the invention] together?", Davis answered, "No, sir." The method of manufacture of a commercial embodiment by embedment molding clearly fell outside the scope of the invention. It is no more than a routine manufacturing choice selected because of expected volume of production and for reasons of cost. It was, therefore, not a "mode" of "carrying out" the invention within the meaning of the statute.

Had Parker said only that "any suitable or desirable means of incorporating a layer

of temperature indicating material within a plastic body," very likely that would have been sufficient for enablement and best mode as to the plastic body. However, he went on to describe in some detail two methods of making the plastic body—adhesive bonding or clamping—and not a third, embedment molding which closely resembles adhesive bonding and which he testified he thought was within that description. By describing *more* than he had to, not too little, Parker's disclosure gave rise to a best mode issue.

The record is devoid of clear and convincing proof—or indeed any proof—that embedment molding had to be disclosed because Parker thought it was "best" for any reason related to his invention other than the commercialization of a particular embodiment. That method of manufacture was selected solely for cost/volume reasons. How to mass produce the device is not, however, a best mode of his invention or part of what he invented. Had the filing of the patent application occurred before a commercial device was made by embedment molding, that best mode argument would be nonexistent. That he filed after a device was made by that method solely for commercialization purposes does not destroy the validity of his claims.

### Use of Polyester Resin

■ This item of nondisclosure merits no more than a passing comment. Burton told Parker that polyester resin was more suitable than acrylic for embedment molding and was cheaper. Thus, the choice of polyester resin was made over acrylic. If injection molding had been selected for fabrication, acrylic would have been used. As indicated by the testimony of Mr. Burton of Burton Plastics, these are matters within the routine knowledge of a plastic fabricator. The specification calls for "a solid body of plastic material" and adequately discloses the best mode of a clear plastic over other materials. The type of plastic is dictated by the need for visibility and heat resistance, information disclosed in the specification. Failure to specify polyester resin does not violate the "best mode" requirement.

### Silk–Screened Thermochromic Paint or Ink on MYLAR Film and Commercial Sources Therefor

■ Thermochromic paint or ink silk-screened on MYLAR is a standard commercial product which Wahl supplied to make the original prototypes. Indeed, Wahl is a U.S. distributor of a product of that type, as well as of thermochromic paints and inks not on a substrate made by the same company, Teika. It is undisputed that names of suppliers of such products are listed in the well-known *Thomas Register.*

With respect to the temperature indicating material, the specification reads as follows: [2]

> Disposed intermediate the faces 16 and 18 is a layer of temperature indicating material 20. Any suitable material which effects a visual indication at a preselected transition temperature may be used for layer 20. Preferably, mercurous oxide [3] which changes from red to black at 70°C. is employed in the illustrated example of a time-temperature indicator for use in preparing an egg. Organic material such as cholesteric type liquid crystals may also be used as a temperature indicating material. These materials are [thermotropic] *thermochromic* or reversible in color with a reversal beyond the transition temperature. Non reversible [thermochromic] material may also be used to read peak temperatures and to retain a permanent record. Such non reversible heat sensitive material which changes color at a predetermined temperature is sold under the trademark "TEMP–PLATE" by William Wahl Corporation, Los Angeles, Cal-

---

**2.** Brackets except for note [3] and italics indicate deletions and additions, respectively, during reexamination to correct the erroneous use of the indicated terms.

**3.** The reference to use of "mercurous oxide" is admitted to be scientifically wrong because that compound will not work. However, the court appears to have accepted that one of skill in the art would know it was wrong and did not rely on this admitted error.

if. The non reversible material is particularly useful in sterilization.

McMillan apparently obtained the thermochromic material he used from a source other than Wahl. He testified he merely had to order it by the temperature and color characteristics which are set out in the specification. Claims 17 and 21 specify that the layer of thermochromic material is to be "flat" and "extends to a location adjacent to the periphery of said body." The drawings in the patent also disclose a flat insert.

The district court held that Parker failed to disclose his "best technique" of incorporating thermochromic material inserts during the embedment molding process. The earlier quoted portion of the court's opinion states that Parker had to disclose (1) silkscreening (2) thermochromic paint or ink (3) obtained from either the Japanese company Teika or the U.S. company, Tempil (4) onto a thin substrate, such as MYLAR and (5) die-cutting oval pieces from the substrate. 12 USPQ2d at 1144–45.

As an initial matter, we have been directed to no evidence in the record to show that the nonreversible materials disclosed in the specification by trademark and supplier were not sufficient to satisfy the best mode of the nonreversible embodiment of the invention at the time the application was filed. Nor with respect to cholesteric-type liquid crystals why they do not satisfy the best mode of a thermochromic, *i.e.*, reversible, temperature indicating material. Nor is there any evidence that these were rejected in favor of the treated MYLAR for functional reasons. The MYLAR insert may merely be a manufacturing choice of convenience.

 Even assuming, however, that the thermochromic MYLAR insert was the best mode for carrying out the invention, instead of *only* a preferred method of mass producing one embodiment of the invention, the district court erred in refusing to consider evidence that this form of insert was so known to those skilled in the art that they would understand to use it, know how to make it, know it was a standard product, and know the sources of supply for the paints, inks or entire inserts, or could easily obtain their names from standard directories. As indicated, the question of what was known or readily knowable to one of skill in the art with respect to the silkscreened thermochromic insert was not addressed by the district court because of its misinterpretation of our decision in *Dana*.

The experts agreed that silkscreened paint or ink on a substrate, such as MYLAR, had long been a standard product to use where a flat thermochromic insert was needed, although that was not the only way to make a flat layer of such materials. The court apparently construed Parker's decision to make thermochromic inserts himself as a best mode decision. However, it was Parker's choice to make inserts rather than buy them merely because of the reduced cost. That choice had nothing to do with a best mode for the invention itself. Moreover, his technique of silkscreening was not only an ancient art but, the record shows, it was long used in connection with placing temperature indicating paints and inks on a substrate. Parker clearly made no contribution to the art of making such inserts and did not have to disclose how to make a standard product. The record also shows that the sources for thermochromic materials known to Parker were generally known sources to those of skill in the art or that their names were readily obtainable.[4] Further, there is simply no evidence that special thermochromic paints or inks were created for or selected by Parker, *cf. Chemcast*, 913 F.2d at 929–30; *Spectra–Physics*, 827 F.2d at 1527, or that the inventor believed that his invention would not work properly without the silk screening of

---

4. Contrary to the district court's view, there is no *per se* requirement to provide names for sources of materials absent evidence that the name of the source would not be known or easily available. Moreover, the specification gives the name of William Wahl Industries as the source of *nonreversible* temperature indicating material sold under the trademark TEMP–PLATE which at least suggests an inquiry to that company. Wahl could have supplied the desired *reversible* insert as well.

paints or inks on MYLAR, *cf. Dana,* 860 F.2d at 419–20. Finally, it hardly needs to be said that cutting to size is within routine skills. Thus, the only open question is whether those of skill in the art would need more information in order to know that thermochromic inserts on a substrate should be used. While the experts' testimony suggests more information was not needed, it is not entirely one-sided. Thus, we believe this disputed factual issue must be decided by the district court.

In sum, the burden was on the infringers to show that the thermochromic inserts were (1) part of the best mode of the invention and not simply a manufacturing choice, and (2) that if part of the best mode, those skilled in the art were not likely to know from the disclosures that were made in the specification, drawings, and claims that such inserts should be used to carry out the invention. Inasmuch as the district court incorrectly relieved appellees of their burden to prove the essential elements of the defense with respect to the thermochromic inserts, summary judgment was improperly granted as a matter of law.

### Costs

The parties shall bear their own costs.

REVERSED–IN–PART, VACATED–IN–PART, AND REMANDED.