**LENZING AKTIENGESELLSCHAFT,**
**Plaintiff,**

v.

**COURTAULDS FIBERS, INC. and**
**Courtaulds PLC, Defendants.**

**No. 93 Civ. 1588 (LLS).**

United States District Court,
S.D. New York.

Nov. 28, 1995.

Brumbaugh, Graves, Donohue & Raymond, New York City (John D. Murnane, Arthur S. Tenser, of counsel), for plaintiff.

Cravath, Swaine & Moore, New York City (Alan J. Hruska, of counsel), for defendants.

### MEMORANDUM AND ORDER

STANTON, District Judge.

Lenzing Aktiengesellschaft ("Lenzing"), an Austrian corporation, sues Courtaulds Fibers, Inc., a Delaware corporation, and Courtaulds PLC, a British corporation with a controlling interest in Courtaulds Fibers, Inc. (collectively "Courtaulds"), alleging infringement of U.S. Patent No. 5,094,690 ("the '690 patent" or "Zikeli's patent"), which Lenzing owns.

Courtaulds moves for summary judgment that the '690 patent is invalid and unenforceable.

### BACKGROUND

Zikeli's patent concerns a process patented in 1969 by Dee Lynn Johnson.[1] Johnson discovered that a natural polymer such as cellulose—e.g., wood pulp—could be dissolved in a solution of water and a chemical called a "tertiary amine oxide." Fibers for making nylon, polyester, and such materials may be spun from the resulting solution—a solution of cellulose in an "aqueous tertiary amine oxide."

In 1980, Neal Franks and Julianna Varga patented a particular method for dissolving the cellulose in the tertiary amine oxide solution.[2] The "Franks and Varga method" involves using a tertiary amine oxide called N-methylmorpholine N-oxide, or "NMMO." In that method cellulose, aqueous NMMO, and water are combined to make an undissolved mixture, or "suspension." Excess water in the suspension prevents the cellulose from dissolving into the aqueous NMMO. When the suspension is exposed to heat and reduced pressure, the excess water evaporates,

---

1. U.S. Patent No. 3,447,939.

2. U.S. Patent No. 4,196,282.

allowing the cellulose to dissolve into the aqueous NMMO.

On August 16, 1988, Stefan Zikeli, an employee of Lenzing, filed an application in the Austrian Patent Office for a patent on a process disclosing steps for carrying out the Franks and Varga method. He filed a corresponding application in the United States Patent and Trademark Office on August 4, 1989, claiming priority based on the filing in Austria, and was granted the '690 patent.

The scope of Zikeli's patented invention is limited by one independent claim and eight dependent claims. Claim 1, the independent claim upon which all the dependent claims directly or indirectly depend, claims:

1. A process for preparing a solution of cellulose in aqueous tertiary amine oxide from a suspension of cellulose in an aqueous solution of said tertiary amine oxide by supplying heat at a reduced pressure, comprising the steps of

providing an elongated heating surface having an input end and an output end,

continuously supplying said suspension to the input end of said heating surface,

mechanically spreading all of said suspension to form a coat or layer as it is supplied to said input end of said heating surface, said coat or layer having one surface in contact with the heating surface and an opposed surface which is exposed to reduced pressure, thereby enabling water to evaporate from said opposed surface,

transporting said formed coat or layer of said suspension along said heating surface from said input end to said output end while simultaneously intensively mixing said suspension, and

continuously discharging said homogeneous solution from the output end of said heating surface.

(col. 5, lines 27–37; col. 6, lines 1–11).[3]

In 1993, Lenzing sued Courtaulds for infringement of this patent.

---

3. Claims 2–9 each limit this process to certain conditions, such as the thickness of the layer of suspension, the type of tertiary amine oxide to be

used (NMMO), temperatures, pressures, and so on.

## DISCUSSION

### A. Summary Judgment

Courtauld claims that Zikeli's patent is invalid on four grounds: that it was obvious, already invented, and anticipated by a prior publication, and that it failed to set forth the best mode contemplated by the inventor of carrying out the invention. Courtaulds also claims that the patent is unenforceable on the ground that Lenzing's conduct in prosecuting the patent was inequitable.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if there is sufficient evidence from which a jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). All justifiable inferences must be drawn in favor of the non-movant, but conclusory allegations are not enough to defeat summary judgment. Anderson, 477 U.S. at 255–56, 106 S.Ct. at 2513–14. Although Courtaulds has the burden of proof on its defenses that Zikeli's patent is invalid or unenforceable, see 35 U.S.C. § 282, Lenzing may not rest on mere allegations in its pleading, but must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256, 106 S.Ct. at 2514.

There are no genuine issues of material fact regarding Courtaulds' claim that Lenzing's patent is invalid for its failure to set forth the best mode.

### B. Best Mode

The best mode requirement is set forth in 35 U.S.C. § 112, the first paragraph of which provides:

"The specification [A] shall contain a written description of the invention, and the

manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and [B] shall set forth the best mode contemplated by the inventor of carrying out his invention."

The United States Court of Customs and Patent Appeals long ago distinguished between portion [A], "enablement," and portion [B], "best mode":

> The essence of portion [A] is that a specification shall disclose an invention in such a manner as will enable one skilled in the art to make and utilize it. Separate and distinct from portion [A] is portion [B], the essence of which requires an inventor to disclose the best mode contemplated by him, as of the time he executes the application, of carrying out his invention. Manifestly, the sole purpose of this latter requirement is to restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their inventions which they have in fact conceived.

In re Gay, 309 F.2d 769, 772 (C.C.P.A.1962). In other words, "there must be no concealment of a mode known by the inventor to be better than that which is disclosed." Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd., 927 F.2d 1200, 1210 (Fed.Cir.), cert. denied, 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991).

■ The best mode analysis has two components, a subjective one and an objective one: in rough terms, whether the inventor had a best mode in mind, and whether he adequately disclosed it. Chemcast Corp. v. Arco Indus. Corp., 913 F.2d 923, 927–28 (Fed.Cir.1990).

## 1. The subjective inquiry

The first part of the best mode analysis looks at "whether, at the time the inventor filed his patent application, he knew of a mode of practicing his claimed invention that he considered to be better than any other.

This part of the inquiry is wholly subjective." Chemcast, 913 F.2d at 927–28. "The specificity of disclosure required to comply with the best mode requirement must be determined by the knowledge of facts within the possession of the inventor at the time of filing the application." Spectra–Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1535 (Fed.Cir.), cert. denied, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987).

■ Although Zikeli testified that his invention is a process that "has nothing to do with a machine" (Zikeli dep. 451–52), section 112 makes no exception for process patents. If an inventor of a process knows of a physical embodiment that is the best mode for carrying out his invented process, he must set forth that physical embodiment in the patent specification to satisfy section 112. See, e.g., Union Carbide Corp. v. Borg–Warner Corp., 550 F.2d 355, 360–63 (6th Cir. 1977) (inventor of a process failed to set forth the best mode in the patent when he did not specify the model of the machine that was the preferred embodiment of his invention).

■ Zikeli assembled an embodiment of his claimed invention to carry out the steps of his patented process. He ran trials of that process with a machine called the Filmtruder HS 0500, made by a company called Buss (formerly known as Luwa). (Defendants' Appendix 19.) Zikeli's Filmtruder was constructed of a special kind of steel known as "steel 14571." (Zikeli dep. 338.) During these trials, a "monopump" was mounted at the top of the Filmtruder, (Zikeli dep. 443–445) and a "discharge pump" was mounted on a flange at the base of the Filmtruder. (Zikeli dep. 101–103.)

Zikeli perceived each of those features of his embodiment as important, and chose to carry out his invented process in the Filmtruder. He explained that the Filmtruder is "a special version of a thin film evaporator."[4] (Zikeli dep. 72.) In an article on thin film evaporators, Erich Heimgartner describes the basic construction of a thin-film evapo-

---

4. Lenzing and Courtaulds differ on whether the Filmtruder should properly be considered a type

of thin-film evaporator.

rator, also known as a thin-film vaporiser, as follows:

"The vertical pipe, surrounded by a heating jacket, forms the heat treatment zone. Inside this pipe, there is a revolving rotor whose blades affect the thin product film. Fixed to the rotor, at the level of the feed opening, is a product distributing ring. Above the heat treatment zone there is an outlet to allow the vapours to escape. At the bottom end there is a conical outlet for the sump product."

*See* Erich Heimgartner, "Devolatilisation in the Thin–Film Vaporiser," in *Devolatilisation of Plastics,* at 70–71 (S. Welling trans. 1980). Heimgartner explains how thin-film evaporators work:

"In a a typical, vertical thin-film vaporiser ... the product containing volatile and non-volatile components is passed continuously into the unit through a feed opening, and evenly distributed on the inside wall of the double-jacketed pipe, using a rotating distributor ring. The rotor blades get hold of the product and spread it out in a thin film. The force of gravity causes the material to run down, following a spiral course, being turned over and over and spread out. At the same time the volatiles evaporate due to external heating. The vapour leaves the apparatus at the top end whilst the devolatilised sump product is run out at the bottom."

*Id.* at 72.

Heimgartner describes the differences between the Filmtruder and the thin-film-evaporator:

"In principle, the construction of the Filmtruder may be compared to that of the thin-film vaporiser, the main difference being its more robust construction, the rotor drive system, the rotor design ... as well as the integrated product discharge."

*Id.* at 79–80. Heimgartner explains that the Filmtruder is used for "the continuous treatment of substances which are too highly viscous" for a thin-film evaporator to handle. *Id.* at 78.

So, what thin-film-evaporators do—continuously pass a product into a vertical pipe surrounded by a heating jacket, distribute

and spread it in a thin film, turn the product over as it moves down the pipe, heat volatiles so they evaporate, and discharge the product—suited Zikeli's claimed steps: "providing an elongated heating surface," "continuously supplying" the suspension, "mechanically spreading" it to form a coat or layer, "transporting" it along the surface while "mixing" it, and "continuously discharging" the resulting solution.

Zikeli testified that other machines would not work. He had used a mixing kettle to carry out the Franks and Varga method, but the kettle had the disadvantage of working only in batches, not continuously, as in Zikeli's process. (Zikeli dep. 237–38.) He also rejected the Viscon Evaporator, a machine similar to the Filmtruder, because it had a pin in its lower bearing which would block the discharge of the solution, creating sediments that would lead to cracks and friction in the bearing (Zikeli dep. 309–10, 313), and because he was averse to it. (Zikeli dep. 313.) Instead, he chose the Filmtruder, "which has external bearings where nothing will block." (Zikeli dep. 310.)

He chose the "monopump" to feed the suspension into the Filmtruder based on his experience with it:

"We said at the time that we thought that NMMO suspension could be transported with it because we used this pump for alkaline cellulose suspension."

(Zikeli dep. 444–45.) He attached a discharge pump to the Filmtruder because it was necessary for the solution to be discharged continuously, (Zikeli dep. 103), and for his invention to work:

"At the discharge outlet one has to block the vacuum and this blocking of the vacuum is carried out by a discharge pump."

(Zikeli dep. 101.)

Zikeli specified that the Filmtruder should be made from a special kind of steel because using other kinds of steel alloys might have been dangerous. Lenzing had "hard discussions" with Buss concerning the construction materials for making the Filmtruder. (Zikeli dep. 337.) Parts of those discussions concerned "a special steel, namely steel 14571." (Zikeli dep. 337–38.) Zikeli explained that

we insisted and where it was technically possible and this special steel was available, that it also be used because of the chemical behavior in respect to amine oxides.

(Zikeli dep. 339.) By "chemical behavior," he meant that amine oxide can dissolve iron from a steel alloy into the amine oxide solution: too much iron in an amine oxide solution could be "mortal" because "it can explode." (Zikeli dep. 339–40.)

Thus, these features comprised Zikeli's best mode because it was his "preferred embodiment." *In re Gay,* 309 F.2d at 772.

Lenzing argues that use of the special steel is not part of the best mode because using such steel was standard operating procedure.

■ Where a feature is the result of a "manufacturing choice of convenience," it is not part of the best mode. *Wahl Instruments, Inc. v. Acvious, Inc.,* 950 F.2d 1575, 1584 (Fed.Cir.1991). An inventor is not required to supply "production" specifications. *Wahl,* 950 F.2d at 1579–80. However, where an inventor selected the feature and believed that his invention would not work without that feature, a production specification is part of the best mode. *Wahl,* 950 F.2d at 1583–84 (citing *Dana Corp. v. IPC Ltd. Partnership,* 860 F.2d 415, 419–20 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989)).

Here, the evidence shows that Zikeli thought that the use of this special steel was necessary to avoid the chance of an explosion, not a "manufacturing choice of convenience." The special steel is therefore a feature of the best mode he contemplated.

Lenzing points out that Zikeli did not choose this embodiment only after trying other embodiments that failed. However, he clearly chose the Filmtruder over other alternatives, such as the Viscon evaporator. Moreover, that an inventor contemplates only one embodiment of his invention supports the conclusion that the sole embodiment was the inventor's best mode. *See Chemcast,* 913 F.2d at 930 (only mode was best mode).

■ Lenzing also points out that Zikeli did not have those components custom-made. However, he did use a custom product, because he insisted that the Filmtruder be made from a special kind of steel. In any event, the best mode may consist of components that are commercially available, and not custom-made. *Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 940 (Fed. Cir.), *cert. denied,* 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 250 (1990).

Finally, Lenzing points out that Zikeli has not explicitly stated that the embodiment he assembled was the best mode. However, section 112 does not require any particular kind of evidence to show what an inventor knew. The evidence is sufficient to show that Zikeli subjectively preferred that embodiment, and no evidence appears from which any contrary inference could justifiably be drawn.

### 2. The objective inquiry

■ The second step of the best mode inquiry is "largely an objective inquiry that depends on the scope of the claimed invention and the level of skill in the art." *Chemcast,* 913 F.2d at 928. Because "both the level of skill in the art and the scope of the claimed invention [are] additional, objective metes and bounds of a best mode disclosure," 913 F.2d at 926, not everything an inventor knows about the best mode for carrying out his invention must be disclosed to satisfy the best mode requirement.

### a. scope of the claimed invention

■ Nondisclosure of information enabling one skilled in the art to carry out the best mode does not violate section 112 if that information falls outside the scope of the claimed invention. *Chemcast,* 913 F.2d at 927. The Federal Circuit has explained:

For example, if one should invent a new and improved internal combustion engine, the best mode would require a patentee to divulge the fuel on which it would run best. The patentee, however, would not be required to disclose the formula for refining gasoline.... Making engines and refining petroleum are different arts.

*Randomex, Inc. v. Scopus Corp.,* 849 F.2d 585, 590 n. 1 (Fed.Cir.1988).

"[B]efore determining whether there is evidence of concealment, the scope of the invention must be delimited." *Christianson v. Colt Indus. Oper. Corp.,* 870 F.2d 1292, 1301 (7th Cir.), *cert. denied,* 493 U.S. 822, 110 S.Ct. 81, 107 L.Ed.2d 47 (1989), *quoted in Chemcast,* 913 F.2d at 927.

Claim 1 limits Zikeli's invention to the steps of providing a heating surface, supplying the suspension, spreading, mixing, and transporting the suspension along the surface, and discharging the solution.

The features of Zikeli's best mode fall within the invention's scope because they are integral to carrying out these steps. The Filmtruder provides a heating surface and spreads, mixes, and transports the suspension along that surface, and the pumps supply the suspension and discharge the solution.

The special steel also falls within the invention's scope. While making the Filmtruder out of the special steel is not integral to any claimed element of the invention, using a Filmtruder made with that steel is necessary to practice the best mode Zikeli contemplated. *See Chemcast,* 913 F.2d at 928 ("[M]ost of the cases in which we have said that the best mode requirement was violated failed to disclose non-claimed elements that were nevertheless necessary to practice the claimed invention"); *Dana Corp. v. IPC Ltd. Partnership,* 860 F.2d 415, 419 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989) (failure to disclose unclaimed fluoride surface treatment that was necessary for satisfactory performance of claimed seal violated best mode requirement).

b. level of skill in the art

■ Nondisclosure of information about the best mode does not violate the best mode requirement if, from what is set forth in the specification, one skilled in the art could discern the best mode. *Chemcast,* 913 F.2d at 929 (disclosure inadequate where, given the specification, one skilled in the art simply could not divine the inventor's preferred material).

■ The specification properly sets forth the best mode if one skilled in the art could discern the best mode from the specification by interpreting terms known in the art, *W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1556–57 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984), or by using "menial tools" or skills of the art. *In re Sherwood,* 613 F.2d 809, 816–17, 817 n. 6 (C.C.P.A.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981).

■ The specification does not set forth the best mode if "the quality of an applicant's best mode disclosure is so poor as to effectively result in concealment" of the best mode, *In re Sherwood,* 613 F.2d at 816, and the best mode requirement is violated if the specification does not set forth the best mode at all. Section 112 requires that the best mode be set forth in the specification. This is true even if a person skilled in the art nonetheless could use his knowledge of the art to deduce the best mode. *See Dana,* 860 F.2d at 418 (best mode requirement violated because inventor failed to disclose whether to use specific surface treatment that he knew was necessary to the satisfactory performance of his invention, even though the treatment was known in the art); *Spectra–Physics, Inc. v. Coherent, Inc,* 827 F.2d 1524, 1537 (Fed.Cir.), *cert. denied,* 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987) ("Coherent did not disclose *any* details about its brazing process. It is this complete lack of detail which effectively resulted in its concealment") (emphasis in original); *but see McNeil–PPC, Inc. v. Procter & Gamble Co.,* 767 F.Supp. 1081, 1085 (D.Colo.1991) ("It may be that the best mode is so obvious and well understood by those skilled in the art that no disclosure is needed at all.").

The specification does not disclose Zikeli's preferred embodiment for carrying out his invention. It does state that

"A suitable arrangement for carrying out the process of the invention, comprises an indirectly heated evacuatable vessel provided with a stirring means, said vessel

designed as a cylindrical container including a centrically mounted stirring shaft having agitators joined thereto, with the radial distance of the agitators from the internal wall of the container being not more than 20 mm and having an intake for the cellulose suspension in the upper part of the container and an outlet for the homogeneous cellulose solution in its lower end.

An advantageous embodiment of the arrangement according to the invention comprises a distribution ring provided at the stirring shaft to spread the cellulose suspension as a layer or coat on the internal wall of the container."

(Col. 2, lines 49–63.) The patent also describes this "suitable arrangement" with respect to Figures 1 and 2 of the patent.

The specification, however, nowhere sets forth Zikeli's best mode of using a special thin film evaporator called a Filmtruder, made out of special steel 14571 to avoid explosions, and with a monopump attached to feed the suspension in and a discharge pump attached to block the vacuum inside the Filmtruder while discharging the solution.

Lenzing argues that at the time the patent application was filed the specification would have disclosed to one skilled in the art of preparing solutions of cellulose in tertiary amine oxides that the best mode of carrying out Zikeli's process was with a Filmtruder.

Zikeli testified that Figures 1 and 2 in his patent were worked out by Lenzing's patent lawyer after Zikeli sent him drawings from the Heimgartner article. (Zikeli dep. 481–82; *see* Heimgartner, *supra*.) Lenzing claims that these drawings show a Filmtruder. Lenzing also points to a letter that Mike Smith, the head of Courtaulds' patent department, wrote to Ehrentraud Falthansl, a Lenzing employee, after Lenzing sent Courtaulds a copy of the then newly issued '690 patent. Smith stated in his letter that

"The origin of your patent drawings is not on the record. We question what that origin is. We believe that you and your U.S. advisors will appreciate the relevance of this to the enforceability of your patent."

(Plaintiff App. 28.) Lenzing argues that this passage shows that Courtaulds knew that the drawings in Zikeli's patent came from the Heimgartner publication and that Courtaulds therefore knew the drawings concerned a Filmtruder.

However, the drawings in Heimgartner's article do not explicitly depict the Filmtruder, but the basic design shared by thin-film evaporators and the Filmtruder. Figure 13 from the Heimgartner article, upon which Zikeli's Figure 1 is based (Zikeli dep. 482), bears the heading "Thin-film vaporiser and Filmtruder design, illustrating the uni-directional and counterflow principles of transporting product and vapour." *See* Heimgartner, *supra*, at 81. Figure 3 from the Heimgartner article, upon which Zikeli's Figure 2 is based (Zikeli dep. 481), bears the heading "Cross-section through a thin-film vaporiser. The flow round a rotor blade is shown schematically." *Id.* at 73. Although Zikeli testified that the drawings from Heimgartner and the drawings in his patent do not exactly correspond, Lenzing has not pointed out any details of these drawings that distinguish Filmtruders from other thin-film evaporators.

Mark Jebson, a Courtaulds engineer, when asked whether and when he acquired information about other companies' use of a Filmtruder to make solutions of cellulose in NMMO, stated that he did so when he was shown the Zikeli patent during 1992. (Jebson dep. 16.) Courtaulds contends that Jebson's testimony should be ignored because, by 1992, he already knew from his experience with Courtaulds that the Filmtruder was a successful mode for making solutions of cellulose in NMMO. Courtaulds also argues that his knowledge in 1992 does not support an inference that anyone, including him, would have arrived at the same inference in 1988, when the application was filed. (Defendants' Reply Br. at 34 n. 25.)

Nevertheless, Jebson's testimony may justifiably support the inference that a person skilled in the art at the time the application was filed might have divined that the best mode of carrying out the invention was with a Filmtruder.

However, Jebson's testimony does not support the inference that such a person could have discerned how to practice other elements of Zikeli's best mode: the special steel and special attached pumps. Nor does Lenzing argue that the patent disclosed this other information; rather, it asserts on various grounds that this information was not required to be disclosed.

First, it argues that use of the special steel and the pumps was standard operating procedure that anyone skilled in the art would know to use. However, even if a person with skill in the art knew of these procedures, the patent fails to satisfy the best mode requirement, because those procedures were contemplated by Zikeli as part of the best mode of his invented process but are not set forth in any way in the specification. *See Dana*, 860 F.2d at 418–19.

Lenzing also argues that section 112 does not require that Zikeli set forth the supplier and trade name information in his patent. That is correct. "Examiners often require that a generic description be inserted in place of, or in addition to, a trade name, on the basis that trade names may, over time, come to represent different things." *Transco Products Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 559 n. 10 (Fed.Cir. 1994), *cert. denied*, — U.S. —, 115 S.Ct. 1102, 130 L.Ed.2d 1069 (1995) (holding grant of summary judgment improper where affidavits created genuine issue whether person with skill in the art would have understood the specification to be a generic description of a specific kind of cloth). The specification may use generic terms to describe the best mode. Nonetheless, those terms must communicate to one skilled in the art what the best mode is. The specification must set forth what the inventor considers to be "the best mode of carrying out his claimed invention, not merely *a* mode of making and using what is claimed." *Chemcast*, 913 F.2d at 928.

The specification of Zikeli's patent does not set forth, generically or otherwise, important features of his best mode: that the invention be carried out in Filmtruder made of steel 14571 to avoid an explosion, that a mono-pump be attached to supply the suspension, or that a discharge pump be attached to block the vacuum while discharging the solution from the Filmtruder.

Hence, the specification of Zikeli's patent does not satisfy section 112. Claim 1 is therefore invalid.

█ A best mode defense affects those claims covering subject matter the practice of which has not been disclosed in compliance with the best mode requirement. *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.*, 927 F.2d 1200, 1209 n. 5 (Fed.Cir.1991), *cert. denied*, 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991). As claims 2–9 all depend either directly or indirectly on the claim 1 and simply claim particular process conditions under which the claimed steps are to be performed, those claims are invalid as well.

The patent is therefore invalid, and Courtauld's motion for summary judgment is granted.

## CONCLUSION

Defendant's motion for summary judgment is granted. The Clerk is directed to dismiss the complaint together with costs and disbursements to defendants as provided by law.

So ordered.