**ADVANCED SEMICONDUCTOR MATERIALS AMERICA, INC., Plaintiff,**

v.

**APPLIED MATERIALS, INC., Defendant.**

**No. C–93–20853 RMW.**

United States District Court, N.D. California.

April 16, 1996.

Don W. Martens, John B. Sganga, Jr., Vito A. Canuso, III, Knobbe, Martens, Olson & Bear, Newport Beach, CA, for Plaintiff.

Matthew D. Powers, Edward R. Reines, Weil, Gotshal & Manges, Menlo Park, CA, for Defendant.

## ORDER GRANTING DEFENDANTS MOTION FOR SUMMARY JUDGMENT FOR BEST MODE VIOLATION

WHYTE, District Judge.

Defendant Applied Materials, Inc.'s ("Applied") motion for summary judgment on best mode violation was heard on February 9, 1996. The court has read the moving and responding papers and heard the argument of counsel. For the reasons set forth below, the court grants defendant's motion.

## I. BACKGROUND

On October 17, 1989, plaintiff Advanced Semiconductor Materials America, Inc. ("ASM") was issued U.S. Patent No. 4,874,-464 ("the '464 patent"), which describes a "process for epitaxial deposition of silicon." On January 11, 1993, ASM filed suit against Applied alleging that Applied's "Centura Epitaxial reactor" infringes its patent in violation of 35 U.S.C. sections 271 and 281.

On October 14, 1994, Applied filed a motion for partial summary judgment, arguing that ASM's patent is invalid for failure to comply with the "best mode" requirement. Applied contended that the patent allegedly disclosed an ineffective method of heating, radio frequency ("RF") heating (also called inductive heating), and did not disclose the "best mode" of practicing the patent, radiant ("IR") heating (also called lamp heating). On November 7, 1994, ASM filed an opposition and countermotion for summary judgment on the best mode defense, in which it contended that it was entitled to summary judgment on the best mode defense because it disclosed IR heating through incorporation by reference to another patent, U.S. Patent No. 4,828,224 (the "Crabb patent"), and because the heating system is not part of the claimed invention and thus no disclosure was necessary. Further, ASM contended that Applied should not be granted summary judgment because factual issues remain as to whether the inventors of the '464 patent contemplated IR heating as the best mode and whether one of ordinary skill in the art would know from the '464 disclosure that the claimed process could be performed effectively with IR heating. On December 16, 1994, this court denied both ASM's and Applied's motions for summary judgment on the best mode defense. In denying Applied's motion the court stated "a reasonable juror, in considering the inventors' declarations, could find that the defendant has not shown 'with convincing clarity' that the inventors contemplated that only IR heating would be effective."

On November 3, 1995, defendant Applied filed another motion for summary judgment on the best mode violation based on discovery taken after this court's December 16, 1994 order. Applied alleges that admissions made during such subsequent discovery by the inventors "establishes that the only plausible conclusion is that lamp heating was preferred by the inventors because, among other things, it provides uniform heating." ASM opposes the motion contending Ap-

plied's present motion is procedurally flawed since Applied failed to first seek court leave for reconsideration of the court's prior ruling on the best mode issue. ASM also reargues that it properly disclosed the IR heating through its incorporation of the Crabb patent application by reference and that the '464 patent adequately discloses to a person of ordinary skill that the '464 process could be used on a radiantly heated reactor.

## II. LEGAL STANDARDS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. Rule 56(c). There is a "genuine" issue of material fact only when there is sufficient evidence such that a reasonable juror could find for the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). Entry of summary judgment is mandated against a party if, after adequate time for discovery and upon motion, the party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This court, however, must draw all justifiable inferences in favor of the nonmoving parties, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520, 111 S.Ct. 2419, 2435, 115 L.Ed.2d 447 (1991).

## III. ANALYSIS

### A. *Procedural issue*

As a threshold matter, ASM argues that Applied's motion for summary judgment on a best mode violation is improperly brought in violation of the local rules because Applied did not seek leave to file a motion for reconsideration pursuant to Civil Local Rule 7–9. Moreover, ASM contends that even if Applied's motion is treated as a motion for leave, the motion does not satisfy the procedural requirements of Civil Local Rule 7–10. Finally, ASM argues that even if the procedural rules are waived, Applied has failed to prove any of the allowable bases for a motion for reconsideration.

Applied has not filed a motion for reconsideration. Def. Reply Supp.Summ.J. Best Mode at 3, fn. 1. It filed a renewed motion. A moving party may renew a motion for summary judgment notwithstanding denial of an earlier motion by showing a different set of facts or some other reason justifying renewal of the motion. William W. Schwarzer et al., *Federal Civil Procedure Before Trial* ¶ 14:367 (1995). The earlier denial is not res judicata or "law of the case." *Id.* (citing *Preaseau v. Prudential Ins. Co. of America*, 591 F.2d 74, 79 (9th Cir.1979); *Golden Gate Hotel Ass'n v. City & County of San Francisco*, 18 F.3d 1482, 1485 (9th Cir. 1994)). Applied argues that its current motion for summary judgment is based on new evidence obtained in recent depositions including those of the inventors. After reviewing the moving and responding papers, this court finds that there is a basis for Applied's renewed motion.

### B. *Substantive issue*

35 U.S.C. section 112 states that the specification in the patent application "shall set forth the best mode contemplated by the inventor of carrying out his invention." The essence of the "best mode" requirement is to compel an inventor to disclose the best mode contemplated by him, as of the time he files the patent application, of carrying out his invention. *Chemcast Corp. v. Arco Industries Corp.*, 913 F.2d 923, 926 (Fed.Cir.1990) ("*Chemcast*"). The sole purpose of such requirement is to restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their inventions which they have in fact conceived. *Id.* It is immaterial whether that failure to disclose is intentional or accidental. *Dana Corp. v. IPC Ltd. Partnership*, 860 F.2d 415, 418 (Fed.Cir. 1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989) ("Dana"). *See*

*also Envirex Inc. v. FMC Corp.,* 28 U.S.P.Q.2d 1752, 1756, 1993 WL 572321 (E.D.Wis.1993), *aff'd,* 16 F.3d 420 (Fed.Cir. 1993) (unpublished) (no requirement that failure to disclose be intentional before it can violate the best mode requirement). Compliance with the best mode requirement is generally a question of fact. *Shearing v. Iolab,* 975 F.2d 1541 (Fed.Cir.1992). However, best mode may be determined as a matter of law if reasonable minds could not differ on whether the best mode requirement is satisfied. *Dana,* 860 F.2d at 419–420.

■■■■ A defendant relying on the "best mode" defense must prove two elements: (1) that the "inventor knew of a mode of practicing the claimed invention that he considered to be better than any other at the time he filed his application" and (2) that the inventors failed to adequately disclose this preferred embodiment of the invention. *Transco Products Inc. v. Performance Contracting, Inc.,* 38 F.3d 551, 560 (Fed.Cir. 1994) (*"Transco Products"*) (citing *Chemcast,* 913 F.2d at 927–928). The first element concerns a subjective factual question: what the inventors believed at the time they filed the application. *Envirex Inc. v. FMC Corp.,* 28 U.S.P.Q.2d at 1757–58. The second element concerns an objective question: whether the disclosure is adequate to enable one skilled in the art to practice the best mode. *Id.* "Of necessity, the disclosure required by section 112 is directed to those skilled in the art." *Chemcast,* 913 F.2d at 926. The adequacy of a best mode disclosure is therefore a function not only of what the inventor knew but also of how one skilled in the art would have understood his disclosure. *Id.* at 927. "However, merely because a technique is generally *known* in the art ... does not eliminate a best mode defect." *Wahl Instruments, Inc. v. Acvious, Inc.,* 950 F.2d 1575, 1580 (Fed.Cir.1991) (*"Wahl"*) (emphasis in original). There is a best mode violation where an inventor contemplated an undisclosed method which was necessary to his invention and affected how well it worked. *Id.* Moreover, there may be a best mode violation even where there is a general reference to the best mode of practicing the claimed invention if the quality of the disclosure is so poor as to effective-

ly conceal it. *Transco Products,* 38 F.3d at 560.

### 1. *Contemplation of the Best Mode*

ASM argues that nothing has changed since Applied's last summary judgment motion on this issue in which the Applied failed to prove that the inventors contemplated any heating source as part of the '464 process best mode. The court disagrees.

The '464 patent lists five inventors, Dennis L. Goodwin ("Goodwin"), Mark R. Hawkins ("Hawkins"), Wayne L. Johnson ("Johnson"), Aage Olsen ("Olsen"), and McDonald Robinson ("Robinson"). At the time of the prior motion for summary judgment, Applied offered various portions of the then existing deposition transcripts of the inventors to support its best mode defense. Inventor Hawkins testified that he never actually worked with an RF-heating apparatus while at ASM. He furthered testified that the reference to RF-heating in the '464 patent was an error; "[t]hey meant IR instead of RF." Reines Decl. (1994) Ex. D at 160. He also affirmed that lamp heating is the method that ASM decided was the best way to achieve temperature uniformity in the '464 patent. *Id.* Inventor Goodwin further supported that ASM was not using RF heating. Reines Decl. (1994) Ex. E at 58. Goodwin stated that the references to RF-heating in the '464 patent were a "screw[ ] up," a "typo," and a "mistake" because RF heating "ha[d] nothing to do with this patent other than prior art." *Id.* Inventor Olsen stated that he understood that ASM had tried RF heating as well as IR heating before he had arrived and had finally settled on radiant heating. Reines Decl. (1994) Ex. F at 132.

ASM, in opposition, offered the declarations of four of the five inventors of the '464 patent, all of whom were ASM employees, to support its contention that the inventors never contemplated IR heating as the best mode. Each declaration contained precisely the same language regarding the inventor's contemplation of IR heating as the best mode:

> I have never considered the apparatus for heating the wafer to be an essential part of

the process described in the '464 patent. How one chooses to obtain the temperature levels is not important. One of many different heating mechanisms may be effectively used to obtain the temperatures we identify for our process. While we developed the patent process on a radiantly heated reactor, we never believed that an RF heated reactor would not work as effectively at obtaining those temperatures.

Goodwin Decl. (1994) ¶ 5; Hawkins Decl. (1994) ¶ 6; Olsen Decl. (1994) ¶ 6; Robinson Decl. (1994) ¶ 6.

Applied argued that these declarations conflicted with earlier deposition testimony and should not be considered. However, the court noted that it did not need to decide whether it found the inventors' declarations persuasive; rather, it only needed to decide whether a reasonable jury could find the best mode defense lacking. The court concluded that a reasonable juror could so find and therefore denied summary judgment as to Applied's best mode defense.

In the present motion, ASM argues that the inventors have not recanted their previously submitted declarations and therefore there still exists a question of fact regarding whether the inventors contemplated radiant heating as the best mode. Although the inventors have not recanted their declarations, Applied's subsequent depositions of inventor Hawkins on October 18, 1995, inventors Goodwin and Robinson on October 19, 1995 and inventor Olsen on October 20, 1995 shed new light on what the inventors understood their declarations to mean and what they contemplated about radiant heating and the '464 process.

Inventor Robinson was the Epsilon group's Director of Analysis and Research, and the number two technical person behind inventor Johnson. During his deposition, Robinson clarified his understanding of the last sentence in the above mentioned excerpt from the inventors' uniform declarations:

Q. Now, in paragraph 6, the last sentence you state, "While we developed the patent process on a radiantly heated reactor, we never believed that an RF-heated reactor would not work as effectively at obtaining those temperature levels."

Again, here you're referring to just the ability of the different heating mechanisms to reach the temperature and not the other parameters, such as the temperature uniformity and things like that?

[Objection]

A. I think that's a fair characterization. Reaching these temperature levels would be no problem with RF. Obtaining uniform water temperatures under all the conditions discussed in the patent would have required a significant engineering effort.

Reines Decl. (11–3–95) Ex. B [Robinson Depo.] at 437:5–437:20.

Robinson also acknowledged that lamp heating was preferred over RF-heating particularly because RF-heating had problems obtaining temperature uniformity in the 4–6 inch wafers which were standard in the late–1980's.

Q. During your work at the Epsilon group, you determined that of those variety of heating mechanisms that could be used for epitaxial deposition for the Epsilon reactor, that lamp heating was the best way of doing it?

A. Could have lots of qualifications, but basically, yes.

Reines Decl. (11–3–95) Ex. B [Robinson Depo.] at 428:21–429:2.

Q. And what was your final conclusion at the end of your work on trying to improve the RF heated reactors in the area of temperature uniformity regarding how they performed compared to the lamp-heated reactors which were common in the industry at the time?

A. The work that we did [with dished susceptors] was on three-inch wafers, and to the best of my recollection, we were able to achieve the same level of skip free performance on three-inch wafers in RF heated reactors as were obtained in radiantly heated reactors at that time.

Q. Was it your experience that as wafers got bigger, lamp heating was better able to uniformly heat the larger wafers than RF heated reactors?

Mr. Sganga [ASM]: If you've got any basis for that.

A. It was not my direct experience, because I didn't work on larger wafers during those years.

Q. Did you hear that from some people?

A. Yes.

Q. Do you have a belief one way or another on that?

A. Yes, that the dished-susceptor approach is more difficult to implement with larger-diameter wafers.

＊ ＊ ＊ ＊ ＊ ＊

Q. When you did your work with three-inch wafers, what was the time frame on that?

A. I can only give you the approximate time frame. It would have been 1974 to 1977.

Q. By 1988, the wafers that were common in the industry were six-inch, five-, six-inch—

A. Yes, four, five, and six inches. That's correct.

Reines Decl. (11–3–95) Ex. B [Robinson Depo.] at 444:11–445:11, 446:11–18.

Moreover, on September 10, 1984, Robinson participated in a presentation which announced to the corporate technical advisory board that one of the important conclusions reached to date was that "[l]amp arrays presently offer the best means for heating single wafers." Reines Decl. (11–3–95) Ex. C.

Not only did Robinson acknowledge that radiant heating was the best mode for the '464 process, he also testified that ASM was committed to the use of radiant heating and did not give further serious consideration to RF heating by the time it was working on the hot pickup. Reines Decl. (11–3–95) Ex. B [Robinson Depo.] at 445:23–446:5. Moreover, he testified that he participated in the decision not to pursue RF-heating. Reines Decl. (11–3–95) Ex. B [Robinson Depo.] at 436:14–17. Robinson, therefore, clearly believed by the time of filing the patent application that radiant heating was the best mode.

Inventor Johnson was the head of the technical team. He testified that by September 1984, he had concluded that lamp arrays offered the best means for heating a single wafer. Reines Decl. (11–3–95) Ex. D [Johnson Depo.] at 105:6–13. He also acknowledged that he agreed with the technical decision to use radiant heat in the project. Reines Decl. (11–3–95) Ex. D [Johnson Depo.] at 79:13–21. Therefore, Johnson also believed at the time of filing the patent application that radiant heating was the best mode.

Inventor Olsen testified he never actively thought about using RF-heating for the process. He just concentrated on developing the lamp-heated Epsilon reactor on which he was working.

Q. Did you ever discuss the possibility of using RF heating for the '464 process with anybody up until—through 1988?

A. No.

Q. As of 1988, had you ever considered the possibility of using RF heating for that process? Was that something you affirmatively thought about?

A. I had not actively thought about it, because all my energies was dealt on developing what we were working on.

Q. Which was the lamp-heated Epsilon reactor?

A. At that time.

Reines Decl. (11–3–95) Ex. E [Olsen Depo.] at 215:10–21.

Olsen also testified that he did not know if other types of heating could achieve the same type of uniformity as radiant heating.

Q. So resistive heating, RF heating, microwave heating, you knew they were capable of obtaining the desired temperatures for the process; you just didn't know whether if they were used for the '464 claimed process in 1988 whether you would get the same type of resistivity uniformity, thickness uniformity results?

A. That's correct.

Reines Decl. (11–3–95) Ex. E [Olsen Depo.] at 220:16–23. Therefore, at the time of the patent application the best heating mode of which Olsen was aware, indeed the only heating method which Olsen knew worked in performing the process, was radiant heating.

Inventor Hawkins also admitted that by 1988, he was only considering lamp-heating for the '464 process.

Q. Do you really have a recollection, sitting here now, of what you were thinking about different heating mechanisms in connection with the '464 patented process back in 1988 when the patent application was being prepared?

A. By 1988, we weren't thinking of other heating processes at that time.

Q. The only one that you were thinking of was lamps, is that correct?

A. By that time, correct.

Reines Decl. (11–3–95) Ex. F [Hawkins Depo.] at 448:10–19. Hawkins, therefore, while implicitly acknowledging that other heating systems had been considered, admitted that radiant heating was the only method considered for the '464 process by the time of filing the patent application.

Finally, inventor Goodwin, testified that he had only used lamp heating and consequently did not know how effective other heating systems would be or what would be required to make them effective.

Q. And because you hadn't used any other heating mechanism other than lamp heating, you didn't know exactly how effective those other heating mechanisms would be for use in the '464 process?

A. I didn't have personal experience in how well they would work in that particular process.

* * * * * *

Q. You had personal knowledge how well lamp heating would work in the context of the '464 hot-load process, hot load and unload?

A. Yes, I knew how well IR heating would work in context to the '464 process.

Q. It's the RF heating that you didn't know about, right?

A. But the RF, we did not use that at that point in time.

Q. And then therefore you didn't know what kind of results you would get?

[Objection]

A. I didn't have personal experience as to how well it would work. There's no doubt

in my mind it could be made to work, though.

Reines Decl. (11–3–95) Ex. G [Goodwin Depo.] at 180:9–23. Like Olsen, at the time of the patent application the best heating mode of which Goodwin was aware, indeed the only heating method which Goodwin knew worked in performing the process, was radiant heating.

Armand Ferro, the Epsilon project's general manager, and a participant in the application process for the '464 patent, also testified regarding the choice between IR and RF heating. He explained that RF heating was not used because it was "very difficult" and "impractical" to get the required uniformity.

Q. Did you process wafers using the inductive-heating [RF] approach for the single-wafer reactor with mechanical support?

A. No.

Q. Why not?

A. The experimental results of the unprocessed wafers in terms of the temperature gradients and the general environment indicated that it would be very difficult to get the uniformity or the quality we needed. There were a lot of calculations done to determine what kind of energy sources would be needed to achieve that quality, and it was deemed too inefficient to generate those sources.

Q. When you talk about lack of uniformity, what specifically was nonuniform in the inductive-heating single-wafer reactor approach?

A. Temperature.

* * * * * *

Q. Were you confident that if you invested sufficient resources, you could achieve uniformity with inductively heating a single-wafer reactor?

A. I believed it was feasible, but it didn't appear practical.

Reines Decl. (11–3–95) Ex. H [Ferro Depo.] at 170:25–171:16; 172:3–7.

Moreover, Ferro testified that lamp heating was selected for ASM's commercial embodiment of the '464 process because "it was the most convenient and readily available commercially, and it was very efficient from

a power viewpoint." Reines Decl. (11–3–95) Ex. I [Ferro Depo.] at 168:19–25.

For the above reasons, the court finds that no reasonable jury could find other than the fact that the inventors contemplated IR (lamp/radiant) heating as the best mode for practicing the invention. It was, in fact, the only mode with which the inventors, at the time for filing the patent application, were able to obtain the temperature uniformity essential to the process.[1]

### 2. *Adequate Disclosure*

Having found that the inventors contemplated IR heating as the best mode for practicing the '464 patent, the court now examines whether it was adequately disclosed in the patent.

■ Relying on *Chemcast*, ASM argues that the '464 patent adequately discloses to a person of ordinary skill in the art that the '464 process could be used on a radiantly heated reactor. Applied contends that ASM misreads *Chemcast*. Applied argues that the *Chemcast* court allowed the level of skill in the art to overcome a best mode violation only where the best mode was so basic that one of ordinary skill in the art would inherently know what the inventor contemplated as his or her best mode. The court agrees with Applied. Although the best mode inquiry is to be answered in the context of those skilled in the art, a best mode defect is not eliminated merely because a technique is generally known in the art. *Wahl Instruments, Inc. v. Acvious, Inc.*, 950 F.2d 1575, 1580 (Fed.Cir.1991) ("*Wahl*").

■ In this case, two of the inventors admitted that the reference to RF heating rather than radiant heating in the specification was an error. Inventor Goodwin testified that RF heating "ha[d] nothing to do with this patent other than prior art." In-

deed, the inventors here knew that the undisclosed radiant heating worked better than RF heating as described in the specification. RF heating had been abandoned by the inventors because it "would have required a significant engineering effort," it was "very difficult" and it was "impractical" to obtain temperature uniformity essential to the '464 process. In light of what the inventors knew, the specification, as issued, was manifestly deficient. Moreover, in light of the level of skill in the art, radiant heat was not implicitly disclosed. ASM's own expert opined that those of "ordinary skill in the art knew that there were at least three types of heating mechanisms [including RF heating and radiant heating] that could be used to heat wafers effectively in a CVD reactor." Gilmore Decl. Ex. 1054 at ¶¶ 17, 18, 20. Therefore, given the specification, one skilled in the art simply could not divine the inventors' preferred heating mode. *Chemcast*, 913 F.2d at 929.

■ ASM next contends that the '464 patent adequately disclosed the best mode through its incorporation by reference to the Crabb patent application. Applied, on the other hand, argues that the Crabb patent application is not properly incorporated by reference because ASM did not follow the guidelines for incorporation set forth in the Patent and Trademark Offices' Manual of Patent Examining Procedure ("MPEP"), which provides:

An application as filed must be complete in itself in order to comply with 35 U.S.C. 112; however this does not bar incorporation by reference. An application for a patent *when filed* may incorporate "essential material" by reference to (1) *a United States patent* or (2) an allowed U.S. application, subject to the conditions set forth below. "Essential material" is defined as

---

1. The importance of such temperature uniformity was noted in this court's prior opinion. Inventor Olsen testified at deposition:

> Q. In using the process of claim 1, for the purpose for which it would be intended, i.e., epitaxial depositions, is temperature uniformity important?
> A. Extremely.

Reines Suppl.Decl. (1994) Ex. A at 153. Inventor Hawkins also testified that temperature uni-

formity was important "[d]uring portions of the process," "[d]uring deposition," and "[d]uring temperature ramps." Reines Decl. (1994) Ex. D at 159. ASM general manager Ferro testified at a previous trial between these parties that the '464 design team's "purpose was to create a more uniform temperature in the wafer." Reines Decl. (1994) Ex. G at 528.

that which is necessary to (1) support the claims, or (2) for adequate disclosure of the invention (35 U.S.C. 112). "Essential material" may not be incorporated by reference to (1) patents or applications published by foreign countries or regional patent offices, to (2) nonpatent publications, to (3) a U.S. patent or application which itself incorporates "essential material" by reference or to (4) a foreign application.

Nonessential subject matter may be incorporated by reference to (1) patents or application [sic] published by the United States or foreign countries or regional patent offices, (2) *prior filed, commonly owned U.S. applications* or (3) nonpatent publications, for purposes of indicating the background of the invention or illustrating the state of the art.

MPEP § 608.01(p)(B) (5th ed. rev.1987) (emphasis added) (citations omitted).

Furthermore, the MPEP provides:

If an application incorporates essential material by reference to a pending and commonly owned application other than one in issue with the fee paid, applicant will be required prior to examination to amend the disclosure of the referencing application to include the material incorporated by reference. The amendment must be accompanied by an affidavit or declaration executed by the applicant or his>or her< attorney or agent stating the [sic] the amendatory material consists of the *same* material incorporated by reference in the referencing application.

MPEP § 608.01(p)(B) (5th ed. rev. 1988) (emphasis in original).

Applied argues that ASM treated the Crabb patent application as containing non-essential matter during patent prosecution. Moreover, ASM argued during the prior motion for summary judgment for best mode violation that the heating system was not part of the claimed invention and therefore no disclosure of it is necessary. The court disagreed and concluded that the heating method was essential matter. The Examiner's failure to require ASM to amend its application for essential material incorporated by reference, in accordance with the MPEP as noted above, suggests that the Examiner believed that the Crabb patent application was being referenced only for the purpose of incorporating non-essential material, i.e. not for incorporating essential matter such as a heating system. The MPEP does allow an incorporation by reference for non-essential material.

In ruling on Applied's prior motion for summary judgment on its best mode defense, this court held that ASM's reference to the Crabb patent application in the '464 patent was inadequate to disclose the best mode because the literal language of the MPEP prohibits incorporation by reference of essential material to anything other than an issued U.S. patent or an allowed U.S. patent application for which the issue fee had been paid, neither category of which covered the Crabb patent application at the time of the filing of the '464 patent.

■ Applied now argues that that ruling by this court is "law of the case." The court rejects Applied's argument because statements made in an order denying a motion for summary judgment are not issues deemed established for trial unless the court so specifies.[2]

Although the MPEP literally prohibits an incorporation of essential material by reference to a co-pending patent application, there is some case law which suggests that under certain circumstances such an incorporation by reference may be adequate to satisfy statutory disclosure requirements. The incorporation by reference of material necessary for adequate disclosure under section 112 has never been permitted for material which is unavailable to the public. *Quaker City Gear Works, Inc., et al. v. Skil Corp.*, 747 F.2d 1446, 1455 (Fed.Cir.1984). Such was the case in *In re Hawkins*, 486 F.2d 569 (C.C.P.A.1973), wherein a patentee attempted to incorporate by reference essential material from pending foreign [British] patent applications which were not readily available

---

**2.** This rule is now expressly set forth in Civil Local Rule 56–3 which came into effect after the date of the court's prior order. However, the rule is consistent with practice before the adoption of the rule.

to either the Examiner or the public. In that case, however, the patentee cured the defect, in accordance with the MPEP, by inserting all the material from the foreign patent applications into the pending U.S. patent application prior to its issue. Unlike *In re Hawkins,* however, there is no serious dispute in this case that the Examiner had access to the co-pending Crabb application during his examination. This is evidenced by the fact that the Examiner himself inserted the Crabb patent number upon its issue on the face of the '464 patent application. Moreover, the Crabb patent issued prior to the issuance of the '464 patent. Therefore, the Crabb patent was available to the public at the time of issuance of the '464 patent. The United States Court of Customs and Patent Appeals ("CCPA") stated in *In re Hawkins* that "the function of section 112 in ensuring complete public disclosure is only violated if the disclosure is not complete at the time it is made public." *In re Hawkins,* 486 F.2d at 574. Consequently, the allowance of the incorporation of the Crabb patent application into the '464 patent in this case does not appear to subvert the underlying purpose of section 112.[3]

■ Even assuming, without deciding, that the Crabb patent application was sufficiently incorporated into the '464 patent despite the lack of literal compliance with the MPEP, the best mode disclosure is inadequate. The '464 patent specification refers to the Crabb patent application in three places:

> [1] After deposition in a reactor such as that disclosed in the co-pending applications by R. Crabb et al., Ser. No. 108,771, and Albert Ozias, Ser. No. 065,945, a controlled low-grade cooling of the reaction chamber is conducted and the reacted wafer removed. ['464 patent at 3:43–48]

> [2] A wafer, which has been preferably been [sic] pre-loaded into the interlock disclosed in the co-pending application R. Crabb et al., Ser. No. 108771, is loaded onto the susceptor at 900°C. ['464 patent at 4:41–44]

> [3] In the processing of over 2,000 150mm wafers in accordance with the inventive process and in the epitaxial reactors disclosed in the co-pending patent applications by R. Crabb et al., Ser. No. 108,771, and Albert Ozias, Ser. No. 065,-945, as heretofore described, substantial uniformity of the crystal lattice has been achieved. ['464 patent at 5:22–28]

The specification refers the reader twice to both the Crabb and Ozias patent applications for the type of reactor to be used. The Ozias patent teaches an improved reaction chamber without mention of any heating mechanism in its specification. Ozias does describe various heating methods including RF in its background of invention. Crabb teaches a new and improved chemical vapor deposition system which specifically incorporates the use of the reactor disclosed in the Ozias patent application and also specifically incorporates a radiant heating system fully disclosed in yet another co-pending application. The third reference to Crabb relates only to an interlock which teaches nothing about the preferred heating method. Reading the specification as a whole, in light of what the inventors knew at the time of filing, the court finds that the reference to Crabb, which could reasonably be read as only a reference to the reactor disclosed in Ozias and to the non-heat related interlock, is such a poor quality disclosure of radiant heating as the best mode for the '464 process as to effectively result in its concealment.

## IV. ORDER

For the foregoing reasons, the court grants defendant's motion for summary judgment for best mode violation.

---

3. As noted earlier, however, the Examiner may not have viewed the reference to the Crabb patent application as being for the purpose of incorporating a heating system into the best mode description in the '464 patent.